UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 08-10234-RGS

UNITED STATES OF AMERICA

v.

DAVID ROBINSON

MEMORANDUM AND ORDER
ON DEFENDANT'S MOTION TO VACATE JUDGMENT

August 26, 2015

STEARNS, D. J.

Petitioner David Robinson moves to set aside his conviction and vacate his guilty plea pursuant to 28 U.S.C. § 2255. Robinson alleges that the well-documented misconduct of former state chemist Annie Dookhan rendered his plea involuntary in violation of the Due Process Clause of the Fifth Amendment. For the reasons stated below, Robinson's motion will be denied.

BACKGROUND

In 2008, the Boston police undertook an investigation they aptly entitled "Operation Curtain Call," intended to suppress drug dealing in

Boston's theater district.[1]  As part of this investigation, on May 1, 2008, an undercover Boston police officer wearing a video recording unit[2] asked Robinson if he had a light for a cigarette.  Robinson replied in the affirmative, and when the officer approached him, Robinson asked if he was "looking," and whether he had "the paper," street terms querying whether the officer wanted to purchase drugs.  The officer stated that he "had 20" and was looking to buy "one," street terms indicating that he wanted to buy one rock of cocaine.  Robinson told the officer to walk with him.  As they walked, Robinson spat out a plastic bag containing a substance that appeared to be cocaine and told the officer to pick it up.  The officer did so and handed Robinson a $20 bill.

After consummating the purchase, the officer presented at a nearby police station where he selected Robinson's image out of a blind photographic display as the individual who had sold him drugs.  The video recording shows the officer reaching down to pick up the plastic bag, and Robinson taking the $20 bill.  The video also shows clear, unobstructed

---

[1] The description of the events leading up to Robinson's arrest are taken from the Presentence Report (PSR), submitted as Gov't's Ex. 1.

[2] Massachusetts law requires the consent of both parties to record conversations without a warrant.  *See* Mass. Gen. Laws. ch. 272, § 99B(4).  For this reason, the device recorded video images only.

images of Robinson's face.  No field test of the contents of the plastic bag was conducted (although the officer who purchased the substance in the bag would testify that it was consistent in texture, odor, and color with cocaine).  The bag and its contents were submitted to the Massachusetts Department of Public Health laboratory in Jamaica Plain, Massachusetts (Hinton Lab) for testing.  Two chemists signed the certificate on July 17, 2008, certifying that the substance was .08 grams of cocaine: Kate Corbett, the principal examiner, and Annie Dookhan.

On August 6, 2008, Robinson was named in a one-count Indictment, charging distribution of cocaine on May 1, 2008.[3]  On March 17, 2009, the

---

[3] Robinson was involved in another sale under similar circumstances on June 9, 2008.  In this transaction, the undercover officer approached Cory Mathis who was standing next to Robinson and asked, "What's up?  Is anyone around?"  Mathis replied that he did not want to do business and walked away.  Robinson ran after the officer, calling "Yo.  Wait up."  Robinson explained to the officer that Mathis had "some," but that he was "overly cautious.  I'll get it from, him, and I'll give it to you."  Robinson asked what the officer wanted.  The officer said that he wanted "a twenty."  Robinson asked, "Do you have straight money"?  The officer told him that he did and Robinson told him to "Wait here.  I'll get it and be right back."  Robinson walked in the direction of Mathis and returned approximately two minutes later.  He instructed the officer to walk with him.  Robinson stopped and placed an item on a window ledge. The officer crumpled up a $20 bill and threw it on the ground.  He then took the item Robinson had placed on the window ledge.  As he walked away, the officer looked back and saw Robinson pick up the $20 bill.  A few minutes later, the undercover officers conducted a stop and frisk of Robinson and Mathis.  The $20 bill the undercover officer had used to purchase the alleged cocaine was found on Mathis.  Robinson was never charged with his participation in this

government filed an Information pursuant to 21 U.S.C. 851, which had the effect of bringing Robinson's prior convictions into play as a sentencing enhancement. The following day, Robinson pleaded guilty without the benefit of a plea agreement. Prior to entering the plea, during discovery, Robinson had been provided a copy of the drug certificate. During the plea hearing, the court (the undersigned judge) asked: "Mr. Robinson, the government is saying on May 1, last year, you basically sold a – it is a small quantity, eight-hundredths of a gram of – [cocaine] . . . – to someone who you, obviously, didn't know was an undercover police officer who actually videotaped the transaction. Is that true? Are you responsible for that sale?" To which Robinson responded, "Yes." Gov't's Ex. 3, at 18.

The Probation Office determined that Robinson was a career offender, given his ten career offender predicate convictions, which included four prior drug distribution convictions. PSR ¶ 63. Robinson received a three-level reduction in his offense level in acknowledgement of his acceptance of responsibility. After the appropriate adjustment of the total offense level,

---

transaction, although the drug quantity involved was referenced in the PSR. Thus, while the May 1, 2008 sale involved 0.8 grams of purported cocaine, Robinson was deemed accountable for a total of .21 grams (the May 1, 2008, 0.8 grams, plus the June 9, 2008, .13 grams). PSR ¶ 25. Because the aggregate amount was relatively minor, the related conduct did not have an impact on Robinson's ultimate sentence.

4

Robinson's advisory Guideline Sentencing Range was 188-235 months (as opposed to 262-327 months). *Id.* ¶ 143. Notwithstanding the Guideline Range, on July 24, 2009, this court sentenced Robinson to a term of 104 months.

On August 30, 2012, the Hinton Lab was shut down after it was revealed that Dookhan had engaged in wide-ranging official misconduct that had potentially compromised the results in thousands of drug tests.[4] Robinson now alleges that the government's failure to inform him of Dookhan's misconduct rendered his plea involuntary.

## DISCUSSION

Section 2255 allows post-c0nviction relief when there is a constitutional defect in a petitioner's sentencing. *David v. United States*, 134 F.3d 470, 474 (1st Cir. 1998). To earn relief from a sentence imposed after a plea of guilty, a defendant must "show that the plea proceedings were marred by a fundamental defect which inherently results in a complete miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure." *United States v. Carrington*, 96 F.3d 1, 5 (1st Cir. 1996). Although this opening for a collateral attack is "narrow," it is "not necessarily

---

[4] Dookhan ultimately pleaded guilty to twenty-seven counts of official malfeasance and was sentenced to a term in state prison.

a dead end." A petitioner can prevail "'on the ground that his guilty plea was not knowing or voluntary if his claim is based on evidence not available to him at the time of the plea.'" *Wilkins v. United States*, 754 F.3d 24, 28 (1st Cir. 2014), quoting *Ferrara v. United States*, 456 F.3d 278, 289 (1st Cir. 2006).

Robinson moves to vacate his guilty plea on the claim that the government's failure to disclose the full extent of Dookhan's misconduct rendered his plea involuntary under *Brady v. United States*, 397 U.S. 742 (1970), and that his due process rights were violated pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). He argues that had he been aware of Dookhan's misconduct at the time he entered his plea, he would have eschewed a plea and proceeded to trial. While section 2255 cases based on Dookhan's misconduct are many, the legal arguments raised are much the same (although varying in intensity in inverse proportion to the degree to which Dookhan was involved in the analysis of the drugs at issue).

Under First Circuit law, to establish that his plea was not voluntary, Robinson must demonstrate (1) "that some egregiously impermissible conduct (say, threats, blatant misrepresentations, or untoward blandishments by government agents) antedated the entry of his plea," and

(2) "that the misconduct influenced his decision to plead guilty or, put another way, that it was material to that choice." *Ferrara*, 456 F.3d at 290.

The First Circuit has left undecided the issue whether Dookhan's misconduct (and the resulting failure of prosecutors to notify defendants of misconduct of which, by its very nature, they could not have been aware) satisfies the "egregiously impermissible conduct" standard of the first prong of the *Ferrara* test. *Wilkins*, 754 F.3d at 28. Instead, the First Circuit to date has focused on the second prong – whether but for Dookhan's misconduct the petitioner would not have pled guilty.

To satisfy this second-prong requirement, Robinson must demonstrate that there was "a reasonable probability that, but for [the misconduct], he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhard*, 474 U.S. 52, 59 (1985). In this context, a reasonable probability is "a probability sufficient to undermine confidence in a belief that the petitioner would have entered a plea." *Ferrara*, 456 F.3d at 290. This in turn depends "in large part on a prediction whether the evidence likely would have changed the outcome of the trial." *Hill*, 474 U.S. at 59. In answering this question, the court is to use an "objective standard." *Wilkins*, 754 F.3d at 28. "The elementary question is whether a reasonable defendant standing in the petitioner's shoes would likely have altered his decision to plead guilty

7

had the prosecution made a clean breast of the evidence in its possession." *Ferrara*, 456 F.3d at 294. The "[r]elevant factors include . . . whether the sequestered evidence would have detracted from the factual basis used to support the plea." *Id.* (citing *Matthew v. Johnson*, 201 F.3d 353, 365 (5th Cir. 2000)).

Although *Wilkins* presented a more factually rich background, here, as in *Wilkins*, the transaction with the undercover officer "followed the pattern of a prototypical street corner drug buy," and provided "powerful circumstantial evidence" of the defendant's guilt. *Wilkins*, 754 F.3d at 29. The experienced officer involved in the sale was prepared to testify that for all appearances the substance he purchased was cocaine. As compelling is the common-sense proposition that "[w]hile episodic sales of counterfeit drugs are not unknown, at a street level, where sales are repetitive and customers are demanding about the quality of what they purchase, any sale of a sham drug is extremely dangerous to an established dealer." *United States v. Wilkins*, 943 F. Supp. 2d 248, 258 n.11 (2013). This is especially true for a dealer who works on a regular basis in a heavily frequented outdoor drug mart.

Nor, as the government points out, is the drug certificate itself without evidentiary value. Dookhan's is the second signature on the certificate,

indicating that Corbett was the primary chemist in Robinson's case. The Office of the Inspector General's report on the extent of Dookhan's misconduct found that there was "no evidence that Dookhan tampered with any drug samples assigned to another chemist even when she played a role in confirming another chemist's test results." *Investigation of the Drug Laboratory at the William A. Hinton Laboratory Institute 2002-2012*, Office of the Inspector General (March 4, 2014) (OIG Report), at 1. See *United States v. Gray*, 2015 WL 178450, at *2 (D. Mass. Jan. 14, 2015) (finding that Dookhan's role as a confirmatory analyst went to the weight the defendant would have given to possible impeachment evidence in deciding to plead guilty).

While *Ferrara* recognized that the "nondisclosure of powerful impeachment evidence" is "apt to skew the decision making of a defendant who is pondering whether to accept a plea agreement," the impeachment evidence at issue in this case is hardly "powerful," 456 F.3d at 296, particularly given Corbett's presumed availability as a witness. Also telling is the fact that even without the certificate, a jury would be warranted in returning a verdict of guilty on both circumstantial evidence – the indicia common to street-level drug sales – and direct evidence – notably Robinson's statements to the undercover officer that he was in the business

of selling drugs. Had Robinson attempted to testify that the substance that he had sold was not cocaine, or that he was unaware of its true nature, he would have been immediately impeached with evidence of his prior drug dealing, including the four prior convictions. *See United States v. Cannon*, 589 F.3d 514, 518-519 (1st Cir. 2009).

Finally, as in *Wilkins*, Robinson "admitted his factual guilt (including the nature of the contraband sold) in open court at the time he [made] his plea. This admission is entitled to significant (albeit not dispositive) weight when, as now, he seeks to vacate that plea through a collateral attack. And such an admission is especially compelling because the petitioner neither attempts to explain it away nor makes any assertion of factual innocence." 754 F.3d at 30 (internal citation omitted).[5]

---

[5] Both Robinson and his attorney have submitted affidavits stating that Dookhan's misconduct would have materially altered their decision to plead, or advice to plead, guilty. As in the *Wilkins* case, "the court does not dismiss the representations of [an] experienced defense counsel who state[s] that [she] would not have advised [her] client[] to plead guilty (or might have delayed giving such advice) had [she] known the extent of Dookhan's misconduct. Relying on its own experience, however, the court does not believe that there is a reasonable probability that [the] defendant would have forgone a guilty plea (whatever counsel's advice) and taken his chances before a jury in light of the strength of the government's evidence" and the benefit that he received by pleading guilty. *Wilkins*, 943 F. Supp. at 257-258. That is especially the case here, where a "bet the house" gamble was likely to cost Robinson another ten or twenty years of his life.

ORDER

For the foregoing reasons Robinson's Motion is <u>DENIED</u>.

SO ORDERED.

<u>/s/ Richard G. Stearns</u>
UNITED STATES DISTRICT JUDGE